APPEALS OF A. W. BLACKIE, JOHN CRAIK, JOHN LAWSON, ALEXANDER B. WILLIAMSON, SIR ROBERT BALFOUR, AND THOMAS J. WHITSON.

Docket Nos. 2282, 2283, 2284, 2343, 2344, and 3478. Submitted June 26, 1925. Decided September 30, 1925.

A debt may be charged off as worthless under the Revenue Act of 1918 when the security therefor has been liquidated and the actual amount of the bad debt ascertained.

*J. Milton Mannon, Jr.*, and *H. D. Costigan, Esqs.*, for the taxpayers.

*A. Calder Mackay* and *Ward Loveless, Esqs.*, for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

The deficiencies involved in these appeals are for the year 1918 and are in the following amounts:

| | |
|---|---|
| A. W. Blackie | $9,700.17 |
| John Craik | 6,101.69 |
| John Lawson | 19,962.80 |
| Alexander B. Williamson | 25,397.74 |
| Sir Robert Balfour | 27,438.47 |
| Thomas J. Whitson | 8,406.72 |

However, the entire amounts of such deficiencies are not controverted in the appeals, and only those portions thereof dependent on the question of the bad debt are at issue.

The appeal of John Lawson involves the additional question as to whether the wife may return one-half of the income as hers under the California community property law. By stipulation between counsel for the parties it has been agreed that, in this appeal, decision may be made on the issue of the bad debt and the decision of the community property issue may be deferred until the decision of the United States Supreme Court in the case of *Robbins* v. *United States*.

FINDINGS OF FACT.

1. Each of the taxpayers named in the above-entitled appeals is a member of the firm of Balfour, Guthrie & Co., which is now, and since long prior to 1910 has been, a copartnership, with offices in

San Francisco, Calif., Portland, Oreg., and other places. The principal office is that in the City of San Francisco. For the calendar year 1918 the partners and their proportionate interests in the copartnership were:

| | Per cent. | | Per cent. |
|---|---|---|---|
| Sir Robert Balfour | 16 | C. J. Williamson | 8 |
| A. B. Williamson | 14½ | A. W. Blackie | 7½ |
| Sir A. Williamson | 4 | T. J. Whitson | 6½ |
| John Lawson | 13½ | John Craik | 5 |
| W. J. Burns | 13½ | | |
| Alexander Baillie | 11½ | | 100 |

2. In 1906 the copartnership, through one of its copartners and two of its employees, caused to be organized, under the laws of the State of Oregon, a corporation known as Balfour-Guthrie Trust Co. This corporation, hereinafter referred to as the Trust Co., had its principal place of business in the City of Portland, Oreg., and the entire issue of its stock was held by the copartnership. It was organized to facilitate the holding and transfer of lands for the copartnership and was empowered to lend and invest moneys as principal, agent, or trustee; to take as security for such loans mortgages, deeds of trust, pledges, or collateral security; to take and hold property of every character as trustee; to act as agent, attorney in fact, or trustee, and to do such other things as trust companies are ordinarily empowered to do.

3. Beginning in February, 1910, and at various times until and including the calendar year 1918, the copartnership made loans to and advances for the account of F. B. Waite, of Sutherlin, Oreg., and the Ashland Orchards Co., an Oregon corporation, in the total principal sum of $220,879.91, exclusive of interest. The loans and advances were used by Waite and his successor corporation in purchasing and carrying a tract of real property consisting of 1,940 acres of land near the town of Ashland, County of Jackson, State of Oregon. Waite added funds of his own to the loans and advances and purchased the land therewith, taking title first in his own name. He then organized the Ashland Orchards Co., a corporation, hereinafter called the Orchards Co., in July, 1910, for the purpose of holding title to the land, and he conveyed title to that corporation. All of the stock of the Orchards Co. was owned by Waite. The loans and advances were made upon drafts drawn by Waite and were paid by checks issued by the copartnership against its bank account. Some advances were made without draft being drawn by Waite, but they were also paid by checks upon the bank account of the copartnership.

4. Originally the advances to F. B. Waite and the Orchards Co. were made on open account by the copartnership and carried on its books of account until June 30, 1910, when the Trust Co. began to

carry the accounts on its books, and were not represented by any notes.  On June 30, 1912, Waite executed and delivered to the Trust Co., as trustee for the copartnership, his promissory note payable one year from date with interest at 6 per cent per annum for the sum of $142,525.59, which was the total amount of loans and advances made to him at that date.  As security for the note for $142,525.59, Waite pledged three certificates of stock representing all the outstanding stock of the Orchards Co. and four notes, all past due, executed by L. D. Kinney, of Coos Bay, Oreg., payable to Waite and by him endorsed in blank.  These notes were for $100,-000, $30,000, $24,650, and $17,250, respectively, or an aggregate amount of $171,900.  Of this amount $20,641.57 had already been paid to Waite on account.  Therefore the sum of $151,258.43 was the total amount remaining due on the notes.  These notes were secured by mortgages upon various lands in Coos County, Oreg., which mortgages were assigned with the notes.  The mortgages were secondary liens, subject to the lien of Coos County for unpaid taxes for the year 1907 and all subsequent years, and also subject to the lien of the "Kollock trust."  The Kollock trust was a trust created by absolute deeds of former owners of the property of John K. Kollock.  However, Kollock held the title solely in trust to secure an indebtedness of the grantors to the Title Guarantee & Trust Co. of Portland in the sum of $54,091.70, together with interest at 5 per cent per annum on the same.

5. On December 31, 1912, in order to secure further the indebtedness of Waite and the Orchards Co. to the copartnership, the Orchards Co. executed and delivered to the Trust Co., as trustee for the copartnership, its note in the sum of $200,000, the approximate amount of the advances at that date, payable on December 31, 1917, with interest at 6 per cent per annum.  To secure this note the Orchards Co. executed and delivered to the Trust Co. a mortgage on all its property.

6. On December 31, 1915, the account for the loans and advances made from the funds of the copartnership to Waite and the Orchards Co. was transferred back from the books of the Trust Co. to the books of the copartnership.  The total of the loans and advances as of that date was $216,935.12 and the unpaid interest was $36,391.27, making the total sum due $253,326.39.  This was entered in the general ledger of the copartnership by a debit in that sum to the Orchards Co. and a crediting of the same amount to the account of the Trust Co.  During 1916, 1917, and 1918 further advances were made, which brought up the total of loans and advances to the sum of $220,879.91.  These advances were made by and from the funds of the copartnership and entered on its books as a charge against the Orchards Co.

7. On December 31, 1918, the note of Waite in the sum of $142,-525.59 was wholly unpaid and he had not repaid any part of the total principal amount of said advances of $220,879.91. The copartnership knew that Waite was financially insolvent, and a further investigation by A. L. Veazie, attorney for the copartnership, disclosed numerous unsatisfied judgments against Waite in the records of Oregon courts. Waite had no assets at that time which could be subject to a writ of execution, and his financial condition.was, and still is, such that legal action against him would not result in the satisfaction of a judgment in whole or in part.

8. On December 31, 1918, the security for the advances, consisting of the notes of L. D. Kinney, was entirely worthless. No payments had been made on the notes. L. D. Kinney was then an inmate of the State insane asylum at Salem, Oreg. He had no assets which could have been subject to a writ of execution, and an investigation by A. L. Veazie, as attorney for the copartnership, had revealed numerous unsatisfied judgments against him in the records of the courts. His financial condition was such that legal action against him could not have resulted in the satisfaction of execution on a judgment in whole or in part.

9. On December 31, 1918, the security, consisting of the mortgages of the Coos Bay lands given by L. D. Kinney to secure his notes to Waite, and later assigned by him to the copartnership, was entirely worthless. The lien of the mortgages had been foreclosed and cut off in tax foreclosure suits brought by Coos County, beginning in the year 1913, in which cases a decree was entered in favor of the county on March 25, 1918, as of and for July 17, 1917. Under this decree the lands were sold to Coos County and all efforts to set aside the tax foreclosure failed. The total amount of the taxes due in 1918 was $121,842.78 principal and $32,524.25 interest. The county, however, offered to compromise its foreclosure suits for $70,000. The Kollock trust was still outstanding as a prior lien on the land ahead of the Kinney-Waite mortgages. Payments on this lien had not been more than sufficient to take care of interest, and there was still more than $50,000 due. Prior to December 31, 1918, the copartnership had made a full investigation of the status of the Coos County lands through A. L. Veazie, its attorney, and through other agents, and had determined that there could be no equity after the taxes and the Kollock trust had been satisfied, and had therefore abandoned all attempts to realize upon the Coos County lands. The copartnership has never since obtained anything from the land and the Kollock trust has never been paid off. In 1922, when the holders of the Kollock trust were still contesting the tax foreclosure suits, they were authorized to compromise their contest and claim for $10,000. An agreement of compromise for $10,000 was then made between

R. S. Howard, Jr., receiver for the Title Guarantee & Trust Co., who held the Kollock trust as an asset, and a syndicate of purchasers from Coos County, but the $10,000 was never paid to Howard.

10. Prior to December 31, 1918, no part of the $200,000 note of the Orchards Co. had been paid. The Orchards Co. had paid nothing on account of the total sum of advances, namely, $220,879.91. The Orchards Co. had no assets except the tract of land purchased by and with the advances. This tract of land had depreciated in value and was then reasonably worth not more than $50,000. The partnership had an investigation of its value made and from this investigation fixed its value at $50,000. On December 31, 1918, by agreement between Waite, the Orchards Co., the copartnership, and the Trust Co. this property was sold and conveyed by the Orchards Co. to the Trust Co. absolutely and outright for the sum of $50,000. The sale price of $50,000 received by the Trust Co. was paid by it to the copartnership and was by the copartnership credited against the total amount of the advances, reducing them from $220,879.91 to $170,879.91.

11. After the conveyance on December 31, 1918, the Orchards Co. had no further assets and the stock of the Orchards Co., pledged by Waite to secure his note of $142,525.59, was therefore totally worthless. Ashland Orchards Co. was thereafter dissolved by proclamation by the Governor of Oregon for failure to pay taxes. After the conveyance on December 31, 1918, the Trust Co. held the land conveyed absolutely and outright in its own name, and the land was by agreement of all parties no longer security for any part of the unpaid balance of the advances, namely, the sum of $170,879.91. Thereafter, the Trust Co. also held the land for its own account and not subject to any trust in favor of the copartnership.

12. On December 31, 1918, after the copartnership had applied the sale price of the Ashland property, namely, $50,000, to total advances and had thereby reduced the amount of the advances to $170,879.91, the copartnership determined this amount to be worthless and charged it off on its books as a worthless debt. No part of this amount has ever been paid to or received by the copartnership, and there are no persons other than those already mentioned liable for payment of the same, and there is no further security for the same. Neither Waite, L. D. Kinney, nor the Orchards Co. have ever since been financially able to pay back these advances or any part thereof, and the real property conveyed to the Trust Co. has never since had a value greater than $50,000.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on consent or on 15 days' notice.

GRAUPNER: The Commissioner contests the claim of the taxpayers for deduction of their respective portions of the asserted bad debt of the copartnership upon the following grounds: (1) That the debt was not that of the copartnership but was one of the Trust Co.; (2) that the debt was not properly ascertained to be worthless in 1918; and (3) that the debt was not charged off in the year 1918.

If the Commissioner is correct in his first contention, the claims of the taxpayers must fall. Therefore, we must first determine whether the debt was properly that of the copartnership.

When the first loans and advances were made to Waite in January of 1910 and until June 30, 1910, the account was carried on the books of the Portland office of the copartnership. On June 30, 1910, the account was transferred to the books of the Trust Co. which had been formed to carry on the details of the land and loan business of the Portland office of the copartnership and was conducted as a department in such office. The transfer was made as a matter of office convenience in order that the Trust Co. might do the accounting and have general supervision over the loan. The moneys that had been advanced and were advanced until December 31, 1915, were from the funds of the copartnership. On December 31, 1915, the account was retransferred to the books of the copartnership, and was continued on such books until it was finally charged off on December 31, 1918. This change was made because the copartnership concluded that it was not suitable to carry accounts of its loans on the books of the Trust Co. Such accounting misrepresented the financial condition of both the copartnership and the Trust Co. The loans and advances were made directly from the funds of the copartnership to Waite or the Orchards Co., and it was but proper that its books should truly reflect the outlay and the debt.

As a matter of fact, the Trust Co. was never the owner of the debt, not even when it carried the account on its books. The loans and advances were made directly by the copartnership and accounting by the Trust Co. could not change the source of the funds. The fact that the Trust Co. held the notes and securities as trustee for the copartnership did not vest it with such right to collect the debt or realize on the securities as would deprive the copartnership of its right to recover any and all amounts paid on the indebtedness. The existence of the relation of trustee to trustor does not deprive the trustor of its right to profit or loss, nor does it raise a bar which will prevent the trustor from claiming its property.

To sustain the Commissioner's contention that the debt was one due the Trust Co. we must hold that the book transfer of June 30, 1910, was an actual transfer of ownership of the debt, and that the

transfer of December 31, 1915, was of no effect. This we can not do. We must hold that in 1918 the debt was one due to the copartnership and not to the Trust Co.

It now devolves upon us to decide whether the debt was properly determined to be worthless in 1918. To do so we must consider what the debt was and what was the value of the securities held on behalf of the copartnership. The total amount of the debt was $220,879.91. There was the note of Waite for $142,525.59 as evidence with the pledge of (1) 1,000 shares of stock of the Orchards Co., and (2) four promissory notes of L. D. Kinney, which were secured by mortgages upon property in Coos County, and the note of the Orchards Co. for $200,000, secured by a mortgage upon the lands of that corporation. The evidence shows that the notes of Kinney and the mortgages given by him as collateral thereto had become worthless; that he was insolvent and mentally incapacitated, and that nothing could be recovered from him. A thorough investigation of Waite, and his own admission, showed that he, too, was insolvent and that his promissory note was valueless. There remained the security of the 1,000 shares of Orchards Co. stock on Waite's note and the note of the Orchards Co. with the mortgage given as security thereon. The Orchards Co. had no assets other than the land. The land, therefore, was the real and only security for the debt, and until it was sold the amount of the debt of Waite and the Orchards Co. could not be ascertained. Under section 234(a)(5) of the Revenue Act of 1918 the copartnership could not charge off as worthless a portion of the debt. *Appeal of Steele Cotton Mill Co.*, 1 B. T. A. 299; *Appeal of Egan & Hausman Co.*, 1 B. T. A. 556; *Appeal of The Murchison National Bank*, 1 B. T. A. 617.

During December of 1918 negotiations were opened with Waite to close the matter. He admitted his inability to pay. The copartnership had the lands of the Orchards Co. appraised and found that the reasonable market value thereof was $50,000. By agreement between Waite, the Orchards Co., the copartnership, and the Trust Co., the properties of the Orchards Co. were sold and conveyed on December 31, 1918, to the Trust Co. for the sum of $50,000, which was paid to the copartnership and applied by it on account of the debt, thus reducing it to the sum of $170,879.91. This transaction erased all value which the note and stock of the Orchards Co. might have had. The debt was without security and the debtors were insolvent. At the time this transaction was concluded, and not until then, the copartnership was in a position to determine the amount of the bad debt. From research previously made and knowledge had at the time it was in a position promptly to determine the worthlessness of the debt. This it immediately did and

wrote off the amount on the books of the Portland office of the co-partnership. We can not but conclude that the determination of the worthlessness of the debt was made in 1918 and could not have been made prior to the liquidation of the security held by it on December 31, 1918.

The remaining point relied upon by the Commissioner appears to us to be without merit. There is no dispute of the fact that the loss was written off on the books of the Portland branch office on December 31, 1918. However, because the main office was in San Francisco and it was manifestly impossible for the copartnership to write off on those books the loss on December 31, the Commissioner contends that the debt was not "charged off within the taxable year." The law does not contemplate unreasonable things. The proper entries charging off the sum of $170,879.91 were made on the general books of the copartnership within a reasonable time and before its books were closed for the calendar year 1918. This is sufficient to comply with the requirements of the statute.

We must therefore disallow those portions of the deficiencies determined by the Commissioner against the above-named taxpayers which result from the disallowance of the bad debt in issue.

ARUNDELL not participating.